IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

ALAN ADAMS,                              *

     Plaintiff,                        *

vs.                                      *        CASE NO. 4:08-CV-53 (CDL)

HARTFORD LIFE AND ACCIDENT                *
INSURANCE COMPANY,
                                      *

     Defendant.                         *

                                      *

O R D E R

    This action arises from Defendant Hartford Life and Accident Insurance Company's denial of Plaintiff Alan Adams's long-term disability benefits.  Plaintiff contends that Defendant, operating under a conflict of interest, arbitrarily terminated his long-term disability benefits in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA").  Defendant responds that its decision to terminate Plaintiff's long-term disability benefits was right, but that even if it was *de novo* wrong, it was nonetheless reasonable under the arbitrary and capricious standard.  Presently pending before the Court is Defendant's Motion for Judgment on the Administrative Record, or Alternatively for Summary Judgment (Doc. 22).[1]  The Court finds that Defendant's denial

_____

[1]When a decision is based on the agreed-upon administrative record, judicial economy favors using findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, not summary judgment under Federal Rule of Civil Procedure 56, to avoid an unnecessary step that could result in two appeals rather than one.  *See Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352, 1363 n.5 (11th Cir. 2008); *see also Chilton v. Savannah Foods & Indus., Inc.*, 814 F.2d 620, 623 (11th Cir. 1987) (per curiam) (noting that the court, and not a jury, is the

of Plaintiff's benefits was arbitrary and capricious, and, therefore, Plaintiff is entitled to recover those benefits.  The Court makes the following Findings of Fact and Conclusions of Law.[2]

FINDINGS OF FACT

**I.  The Policy**

Effective January 1, 2003, Defendant issued Group Policy No. GLT-674531 ("Policy") to Plaintiff's employer, Synovus Financial Corporation ("Synovus"), to fund long-term disability benefits sponsored and maintained by Synovus for its employees.  (Ex. 2 to Def.'s Mot. for J. on the Admin. R. [hereinafter Def.'s Mot.], Hartford Life & Accident Ins. Co. Policy, No. GLT-674531 [hereinafter Policy].)  Under the terms of the Policy, "Disability or Disabled" was defined as the following:

---

proper factfinder in an ERISA case).  Federal Rule of Civil Procedure 52(a)(1) provides, in pertinent part, that

> [i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.

[2]The Court bases its Findings of Fact and Conclusions of Law on the administrative record that was available to the plan administrator when it made its decision to deny benefits.  *See Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008) ("When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard . . . , the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." (internal quotation marks omitted)); *Jett v. Blue Cross & Blue Shield of Ala., Inc.*, 890 F.2d 1137, 1139 (11th Cir. 1989) (same).

> **Disability or Disabled** means that during the Elimination
> Period and for the next 24 months you are prevented by:
> 1.   accidental bodily injury;
> 2.   sickness;
> 3.   Mental Illness;
> 4.   Substance Abuse; or
> 5.   pregnancy,
>
> from performing one or more of the Essential Duties of Your
> Occupation, and as a result your Current Monthly Earnings
> are no more than 80% of your Indexed Pre-disability
> Earnings[.]
>
> After that, you must be so prevented from performing one or
> more of the Essential Duties of Any Occupation[.]
>
> Your failure to pass a physical examination required to
> maintain a license to perform the duties of Your Occupation
> does not alone mean that you are Disabled.

(Policy 18.)

When making a benefits decision under the Policy, Defendant had "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (*Id.; see id.* at 22 ("The Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy.").)

Defendant also was responsible for paying benefits under the Policy.   As both the evaluator and payor of claims, Defendant operated under an inherent conflict of interest.

## II.  **Plaintiff's Employment**

Plaintiff worked for Synovus as a Systems Software Analyst I. (Ex. 3 to Def.'s Mot., Admin. R. at CL000073, CL000089.)  Plaintiff was

> [r]esponsible for implementing and maintaining the vendor supplied mainframe and mid range systems for the [Total System Services, Inc. ("TSYS")] environments.    This includes all approved vendor hardware and software for enabling the developmental and operational groups to perform their assigned tasks.    Serves as a technical resource for the company and is responsible for resolving issues with the hardware and software used at the TSYS installations.

(*Id.* at CL000087.)  Plaintiff "perform[ed] assigned tasks to install, maintain, monitor, document, and recover mainframe and mid range systems."  (*Id.*)

Plaintiff's position required him to sit continuously and to perform frequent keyboard/repetitive hand movements.    (*Id.* at CL000074.)  Plaintiff's position also required him to "[s]hare[] ideas and information," "[p]rovide[] clear and concise documentation," "[d]emonstrate[] effective written and oral communication," "[d]emonstrate[] proficiency in assigned programming language(s)," "[a]ttend[] to details," "[m]anage[] time productively," and "[m]anage[] multiple tasks/priorities."  (*Id.* at CL000088.)  Plaintiff's position involved "decision making, recognizing/resolving issues[,] [and] pursu[ing] new/additional opportunities."  (*Id.*)

4

**III. Plaintiff's Claim for Long-Term Disability Benefits**

Plaintiff suffered from a series of strokes, one in the early 1990s, one in 1999, and the most recent one on or about June 17, 2005. (*Id.* at CL000189, CL000239.) On June 18, 2005, Plaintiff went to the emergency room and was admitted for an acute onset of double vision. (*Id.* at CL000239.) Plaintiff's CT scan showed two low attenuation areas, just in the right basilar ganglion in the left periventricular area consistent with old infarcts. (*Id.* at CL000236.) After numerous tests, Plaintiff was placed on anti-stroke medication and discharged on June 22, 2005. (*Id.* at CL000232-34.) Shortly after his discharge from the hospital, Plaintiff returned to the care of Dr. Terry Cone, who had been his primary care doctor for some time. In his July 6, 2005 report, Dr. Cone noted that Plaintiff was still suffering from double vision. (*Id.* at CL000217.)

Plaintiff began regular treatment with Dr. Jagdish Sidhpura, a neurologist, who had treated Plaintiff for a previous stroke. (*Id.* at CL000195.) On July 11, 2005, Plaintiff went for his first follow-up visit with Dr. Sidhpura since his discharge from the hospital on June 22, 2005. (*Id.*) Dr. Sidhpura's office notes stated:

> In June 2005 he presented to Doctors Hospital ER with history of double vision and some imbalance and on clinical exam he had vertical gaze palsy. There was no demonstrable weakness in the extremities. He thinks that his vision has improved, but not quite completely back to normal. He still sees double at times, but interestingly he sees horizontal double vision. Denies any weakness in the extremities. He generally sleeps well at night, but also

5

heavy snorer and continues to have some daytime fatigue and tiredness. He is also very overweight.

(*Id.*) Dr. Cone noted in his August 8, 2005 notes that Plaintiff's double vision "ha[d] not resolved" and that "[Plaintiff] saw Dr. Sidhpura recently who told him it would take time and said evaluation by an ophthalmologist or treatment from a therapist would not give benefit." (*Id.* at CL000197.) On August 29, 2005, Plaintiff returned to Dr. Sidhpura with complaints of an inability to "think well." (*Id.* at CL000193.) Dr. Sidhpura diagnosed Plaintiff with "[a]cute vertical gaze palsy and diplopia." (*Id.*)

On August 25, 2005, Dr. Cone completed an Attending Physician Statement where he listed a primary diagnosis of "[Cerebrovascular Accident ("CVA")]" and a secondary diagnosis of "metabolic syndrome." (*Id.* at CL000094.) Dr. Cone listed double vision as Plaintiff's physical impairment and noted that Plaintiff had a "major impairment" in several areas, including work and family relations, that rendered him "unable to work." (*Id.* at CL000095.)

On August 31, 2005, Plaintiff applied for long-term disability benefits. (*Id.* at CL000089-93.) Plaintiff stated that he suffered from "[d]ouble vision, weakness, [and] loss of equilibrium." (*Id.* at CL000089.) In his application for long-term benefits, Plaintiff noted that he could perform all activities of daily living "independently." (*Id.* at CL000090.) Plaintiff further noted that he had not "suffered a severe Cognitive Impairment that render[ed] [him]

unable to perform common tasks, such as using the phone, money management, or medication management[.]" (*Id.*)

In a telephone interview with Defendant on September 20, 2005, Plaintiff stated that he "recovered quicker" from his two previous strokes and that, typically, a "neuro[logist] said it should take 12 weeks to recover but his recovery has been much slower." (*Id.* at CL000024.) Plaintiff also stated that the "other two strokes were bigger than th[e] [June 2005 stroke]," and that the "other strokes took out [the] whole side of [his] body and he had to learn to walk and talk again." (*Id.*) Plaintiff noted that although "he desperately want[ed] to go back to work," "searching thr[ough] [a] system log would be impossible at this time." (*Id.* at CL000025.) Plaintiff also stated that "he [was] having more bad days than good," and that he felt like he was "seeing worse than what he was two weeks after [the June 2005] stroke." (*Id.*)

On October 3, 2005, Dr. Cone's medical records revealed that Plaintiff's "vision problem [was] unchanged," and that Plaintiff was "becoming more unstable emotionally." (*Id.* at CL000197.) On October 11, 2005, Defendant awarded Plaintiff long-term disability benefits (*id.* at CL000208), with an effective date of September 15, 2005 (*id.* at CL000211). On October 24, 2005, Erin Gunti, Defendant's senior claim examiner, and Valerie Allen, Defendant's vocational specialist, reviewed Plaintiff's file and noted that although "his diplopia ha[d] not resolved," Plaintiff's "vision ha[d] improved" and that "[i]t

appear[ed] that he w[ould] be able to [return to work] at some point in the near future." (*Id.* at CL000016-17.)  They further noted that Plaintiff's "primary residual problems appear[ed] to be problems with concentration . . . and general fatigue." (*Id.*)

Plaintiff also received a neurological evaluation from Dr. Jonathan Liss, who is board certified in Sleep Medicine and Neurology. (*Id.* at CL000140.)  Dr. Liss noted on November 1, 2005 that Plaintiff "still ha[d] poor downward gaze where he feels he ha[d] some skewing of vision," but noted that Plaintiff "denie[d] any new cranial nerve deficits, focal motor changes, sensory problems or coordination difficulties." (*Id.*)  On December 21, 2005, Plaintiff reported to Defendant that his "eyes have stayed the same" and that "last week was [a] good week but this week [he] has had really bad 'seeing days.'" (*Id.* at CL000016.)  Plaintiff also stated that he was having panic attacks where "he fe[lt] like things [were] 'closing in' on him," and that he was trying to accept his eye problems and "work with it." (*Id.*)  Plaintiff noted that "his intention [was] to [return to work][]" and that "he ha[d] asked work to cont[inue] to hold his position." (*Id.*)

On December 22, 2005, approximately six months after Plaintiff's June 2005 stroke, Defendant's medical clinical case manager, Stacy Eremchuk, R.N., reviewed Plaintiff's file and opined that a six-month recovery for his vision would be expected. (*Id.* at CL000015.)  Ms. Eremchuk further noted that based on Plaintiff's history of "two

8

previous [strokes] and continued ongoing acute vertical gaze palsy and diplopia that loss of functionality would be supported," and that Plaintiff's vision would "either correct itself or it [would not]." (*Id.*) On February 3, 2006, Dr. Cone called Defendant and stated that Plaintiff's "vision problem [was] unc[hanged]." (*Id.* at CL000014.)

On March 6, 2006, Ms. Eremchuk determined that Plaintiff "appear[ed] to be medically stable and he should be able to perform a sedentary occupation with possible restrictions for double vision occurring on occasion with downward glazing." (*Id.* at CL000012.) On April 4, 2006, Plaintiff went to Dr. Liss for a second opinion. (*Id.* at CL000197.) In his April 4, 2006 office notes, Dr. Liss noted that Plaintiff "ha[d] not had any new problems." (*Id.* at CL000135.) Dr. Liss also noted that he was "pleased that [Plaintiff] [was] doing well." (*Id.*) On April 6, 2006, Plaintiff advised Ms. Gunti, Defendant's senior claim examiner, that he was presently being treated by Dr. Liss, and therefore, Defendant should obtain information regarding his restrictions and limitations from Dr. Liss. (*Id.* at CL000011.) Plaintiff informed Ms. Gunti that his "eye stuff hasn't improved much," and that "he fell down the stairs the other day because he misjudged with his eyes." (*Id.*)

On April 7, 2006, Ms. Eremchuk sent a letter to Dr. Liss, which stated that according to Plaintiff's current medical records, it appeared that he had the "functional capacity to perform his own sedentary occupation." (*Id.* at CL000168.) The letter further stated

9

that although Plaintiff "d[id] have occasional vertical double vision, . . . it appear[ed] that he would be capable of returning to his regular occupation, with perhaps, occasional double vision which is normally treated with an eye patch." (*Id.*) Ms. Eremchuk asked Dr. Liss to indicate whether he agreed that "[b]ased upon the information reviewed to date, [Plaintiff] [was] capable of performing his original occupation." (*Id.*) Dr. Liss checked the box "I agree" and signed the form on April 14, 2006. (*Id.*) On April 20, 2006, Plaintiff called Defendant and stated that "he was a little [shocked] about [the] rel[ease] to [return to work]" and that his return to work "was never discussed with [D]r. [L]iss." (*Id.* at CL000008.)

On April 24, 2006, Defendant, relying upon Dr. Liss's check in the "I agree" box, advised Plaintiff by letter that his long-term disability benefits would not be payable after April 13, 2006. (*Id.* at CL000030-34.) The letter advised Plaintiff that Defendant had considered all of the records in his claim file, including the medical records from Dr. Cone, Dr. Liss, and Dr. Sidhpura, the attending physician statement by Dr. Cone on August 25, 2005, the letter from Dr. Liss dated April 14, 2006, and Plaintiff's job description submitted by Synovus. (*Id.* at CL000032.) Defendant stated that although Plaintiff had "occasional vertical double vision," this could normally be treated with an eye patch. (*Id.*) Defendant specifically noted that Dr. Liss agreed that Plaintiff was

"capable of performing [his] own occupation." (*Id.* at CL000033.) Finally, Defendant advised Plaintiff of his right to appeal. (*Id.*)

## IV.  Plaintiff's Appeal of Defendant's Long-Term Disability Benefits Decision

On November 28, 2006, Plaintiff submitted an appeal by letter and submitted additional documents to support his appeal. (*Id.* at CL000129-31.) In Plaintiff's appeal letter, Plaintiff stated that his "downward gaze (the tracking of the eyes in unison when moving from up to down) has been consistently faulty," and that his eyes "do not move together when [he] look[s] from up to down," which "makes the task of scanning computer screens for problems very time consuming, and sometimes impossible." (*Id.* at CL000129.) Plaintiff further stated that his "cognitive acuity has also been impaired" and that he "find[s] it very difficult to stay focused on a specific task: [he] become[s] easily distracted and confused, and often cannot apply skill sets or previous knowledge to the successful completion of a task, leaving tasks incomplete or inaccurately completed." (*Id.* at CL000129-30.) Plaintiff concluded that he was "not mentally, physically, or emotionally stable enough to be employable." (*Id.* at CL000130.)

Plaintiff included documents from Dr. Liss and Dr. Ona Graham to support his appeal. Those documents indicate that on June 7, 2006, Plaintiff returned to Dr. Liss for an appointment. During the office visit, Dr. Liss noted,

> [Plaintiff] returns to the office today with history of
> stroke.  He returns to the office today noting that he is
> having trouble with his disability.  We signed a form
> noting that he was mentally capable of handling his
> finances and such.  However, he notes that his job is very
> complicated mentally.  He works for Total Systems in
> technical support.  He feels that he cannot proceed with
> this.  In fact, his job will not take him back at this
> time.
>
> . . . .
>
> We are going to ask [Plaintiff] to undergo a full
> neuropsychological panel.  It will be a very good way to
> better access his cognitive abilities.  Based on these
> results, we will be in a better position to either
> recommend he return to work or remain on disability.  We
> will see him back after the testing.

(*Id.* at CL000134.)

Plaintiff's documents also indicated that he presented to Dr.
Ona Graham on September 27, October 3, October 4, and
October 11, 2006 for a battery of cognitive tests: Mental Status
Exam, Review of Records, Test of the Variables of Attention, Wechsler
Adult Intelligence Scale III, Wide Range of Achievement Test 3,
Delis-Kaplan Executive Functions System, and Personality Assessment
Inventory.  (*Id.* at CL000122-27.)  Dr. Graham noted in her report
that throughout testing, "[o]n timed tests such as Arithmetic,
Picture Arrangement, Coding and Symbol Search, [Plaintiff] did more
poorly and was much more frustrated and emotional," and that "[w]hen
confronted with processing deficits in the area of math and numbers,
[Plaintiff] was particularly upset and reported that he was able in
the past to manipulate numerous streams of numeric sequences with no
difficulty."  (*Id.* at CL000123.)  Dr. Graham further noted that

12

Plaintiff "demonstrated profound attentional deficits," and that "[h]is overall performance was in the less th[a]n 0.1 percentile. [Plaintiff] was able to attend to the task during the first five minutes after which his performance dropped from average to profoundly impaired." (*Id.*)  In summary, Dr. Graham noted,

> [Plaintiff] is a 40-year-old man who has suffered three strokes and has numerous significant health issues. There is evidence of impairment in cognitive functioning in a number of spheres.   Significant difficulty sustaining attention interferes with [Plaintiff's] ability to perform on all tasks, but especially those which are timed. [Plaintiff] has learned to employ numerous compensatory strategies which aid him in completing some cognitive tasks successfully, but which require a tremendous amount of energy and time resulting in increased fatigue, frustration and irritability.  Given [Plaintiff's] premorbid level of intelligence, he is acutely aware of the decline in his cognitive functioning.   This awareness contributes to feelings of low self-esteem, damage and depression.   The more complex the task the more difficulty [Plaintiff] demonstrates.   His best performance appears to be on nonverbal tasks as demonstrated on both the [Wechsler Adult Intelligence Scale] III and the [Delis-Kaplan Executive Functions System] Tower Test.   [Plaintiff] demonstrates problems with anxiety and depression. He has ongoing health issues which will require ongoing management.   It is difficult to say at this time how much [Plaintiff's] sleep difficulties contribute to his profoundly impaired attentional skills and declining verbal executive skills. These two systems in the brain interact and reinforce each other in order to guide goal directed activities. [Plaintiff] is experiencing significant decline in his ability in these areas.  A number of the systems involved in regulating and sustaining cognitive arousal are located in the region of the brain stem.   It would be hard to discount the impact of the strokes on his poor cognitive functioning.  It is equally difficult to ignore the impact of poor sleep on his ability to function cognitively.

(*Id.* at CL000124.)   The Personality Assessment Inventory, used to determine whether "there were severe psychiatric issues underlying

[Plaintiff's] difficulties," contained validity scales that indicated that "th[e] profile c[ould] be interpreted with a good degree of confidence in the results." (*Id.*) Specifically, Dr. Graham's report stated,

> There were no clinically elevated scales reflecting a severe psychiatric illness.  Several scales were elevated which indicated that [Plaintiff] has significant concerns regarding his health, with primary complaints focused on sensory, motor and difficulties with cognition.  This pattern of elevation is consistent with [Plaintiff's] documented history of health concerns.

(*Id.*)  There is no evidence in the record that any other validity scales were administered.

On October 20, 2006, Plaintiff asked Defendant for an extension in order to get his medical records for the appeal process, but Defendant stated that it "[could] not do an ext[ension]." (*Id.* at CL000006.)  On October 26, 2006, Defendant received a letter from Dr. Liss which stated,

> [Plaintiff] has been seen under my neurologic care for evaluation of prior stroke and cognitive complaints.  The patient does indeed have cognitive problems that impair[] his ability to work at this time.  As noted in Dr. Graham's neuropsychological profile, [Plaintiff] does need to meet with a psychiatrist for further treatment and also have further care of his sleep problems.  It is my suspicion that it will be at least six months to a year before he is able to consider gainful employment.

(*Id.* at CL000132.)

On December 19, 2006, Defendant requested an independent comprehensive case review (*id.* at CL000110), which was performed in March 2007 by Carol Walker, a board-certified physician in Clinical

14

Neuropsychology (*id.* at CL000106-08).  Dr. Walker was unable to speak with any of Plaintiff's physicians before completing the independent comprehensive case review, noting that Plaintiff's attending physician and neuropsychologist "refused because of [Health Insurance Portability and Accountability Act ('HIPAA')] issues," and that "[a]fter notification that [Plaintiff] had signed a release at Dr. Liss's office . . . [Dr. Walker] was told [that] [Dr. Liss's] office was damaged by a tornado last week," and as a consequence, Dr. Walker was unable to speak with Dr. Liss before submission of the review. (*Id.* at CL000107.)

Upon assessing Dr. Graham's report, Dr. Walker noted,

Dr. Graham opined that damage to the brainstem, in conjunction with [Obstructive Sleep Apnea Syndrome], contributed to [Plaintiff's] test performance. While this is a possibility, no measures of symptom validity were administered even though it was apparent the evaluation was being completed for continuation of disability benefits. Because of the failure to assess symptom validity, the potential effects of secondary gain or lack of effort on testing is not determinable.

(*Id.* at CL000108.)  Dr. Walker also noted that "[t]here [was] no supporting evidence of change in [Plaintiff's] functionality from the time Dr. Liss opined he could return to work in April 2006 versus his status in October 2006."  (*Id.*)  Dr. Walker conducted a review of Plaintiff's medical records and concluded, from a psychological and a neurological perspective, Plaintiff "should be able to return to work."  (*Id.*)  Dr. Walker reasoned that Plaintiff had "reportedly suffered two small strokes in the basal ganglia in the past," but

that "[h]e was able to return to work after these events without difficulty." (*Id.*) Dr. Walker opined that Plaintiff's June 2005 stroke "would not be expected to lead to cognitive deficits," and that "[w]hile his diplopia might cause him to experience difficulty in task performance, this is often correctable with patches or prism lenses." (*Id.*) Dr. Walker concluded that, "[b]ased on the information sent for review [Plaintiff] [was] not functionally impaired from working." (*Id.*) On March 19, 2007, Defendant's appeal specialist, Robyn Cote, reviewed Plaintiff's file. (*See id.* at CL000001-03.) Ms. Cote noted that Dr. Liss's October 2006 opinion "related to cognitive impairment appear[ed] related to Dr. Graham's report." (*Id.* at CL000002.)

By letter dated March 19, 2007, Defendant upheld its determination on appeal. (*Id.* at CL000097-98.) Defendant noted that it reviewed, among other things, "Appeal Letters from [Plaintiff] dated 10/20/06 and 11/28/06," "Neuropsychological Summary by Dr. Ona Graham dated 9/27/06 through 10/11/06," "Medical Notes from Dr. Jonathan Liss dated 11/1/05 through 10/26/06," and the "Independent Medical Review." (*Id.* at CL000097.) Defendant noted that "[t]here [was] no supporting evidence of change in [Plaintiff's] functionality from the time Dr. Liss opined [Plaintiff] could return to work in April 2006 versus [Plaintiff's] status in October 2006." (*Id.* at CL000098.) Defendant concluded that "based on [a] review of the

16

records, from a psychological/neuropsychological perspective, [Plaintiff] should have been able to return to work 4/14/06." (*Id.*)

On or about March 17, 2008, nearly one year after Defendant's final appeal decision, Plaintiff submitted a letter enclosing additional documentation purportedly in support of Plaintiff's long-term disability claim. (*Id.* at CL000001.) By letter of March 20, 2008, Defendant returned to Plaintiff the additional information he submitted. (*Id.*) Defendant advised Plaintiff that its March 19, 2007 decision was "based on a complete and final administrative record," and therefore, "the administrative remedies provided by ERISA and the [Policy] [had] been exhausted." (*Id.*) Defendant noted that "[t]here [were] no provisions for additional appeals or re-opening the administrative record after a final appeal determination." (*Id.*)

CONCLUSIONS OF LAW

**I.  ERISA Analytical Framework**

ERISA permits "a person denied benefits under an employee benefit plan to challenge that denial in federal court." *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346 (2008). The following principles should guide a court's review. First, the court reviews "a denial of plan benefits 'under a *de novo* standard' unless the plan provides to the contrary." *Glenn,* 128 S. Ct. at 2348 (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989)). Second, "[w]here the plan provides to the contrary by granting the

17

administrator . . . *discretionary authority* to determine eligibility for benefits, . . . a *deferential standard* of review [is] appropriate[.]"[3]  *Id.* (internal citation and quotation marks omitted). Finally, "[i]f 'a benefit plan gives discretion to an administrator . . . who *is operating under a conflict of interest*, that conflict must be *weighed as a factor* in determining whether there is an abuse of discretion.'"  *Id.* (quoting *Firestone*, 489 U.S. at 115).

## II.  The Policy's Discretionary Language

In this case, the Policy provides that Defendant had "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy."  (Policy 18; *id.* at 22.)  Therefore, the deferential arbitrary and capricious standard applies.  *See Guy v. Se. Iron Workers' Welfare Fund*, 877 F.2d 37, 38-39 (11th Cir. 1989) (holding that arbitrary and capricious standard was appropriate because plan conferred upon administrator "full and exclusive authority to determine all questions of coverage and eligibility" and "full power to construe the provisions of [the] Trust" (alteration in original) (internal quotation marks omitted)); *see also Jett*, 890

---

[3]This deferential standard is an abuse of discretion standard, which the Eleventh Circuit equates with an arbitrary and capricious standard. *Doyle*, 542 F.3d at 1356; *Yochum v. Barnett Banks, Inc. Severance Pay Plan*, 234 F.3d 541, 544 (11th Cir. 2000) (per curiam); *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1450 n.2 (11th Cir. 1997); *Jett,* 890 F.2d at 1139.

F.2d at 1139 (holding that arbitrary and capricious standard of review was applicable because plan gave administrator "the exclusive right to interpret the provisions . . . so its decision [was] conclusive and binding"). To determine whether the denial was arbitrary and capricious, the Court must first examine *de novo* whether Defendant's decision to terminate Plaintiff's long-term disability benefits was wrong. *See Doyle*, 542 F.3d at 1356.

### III. Defendant's Denial of Plaintiff's Long-Term Disability Benefits Was *De Novo* Wrong

"A decision is 'wrong' if, after a review of the decision of the administrator from a *de novo* perspective, the court disagrees with the administrator's decision." *Glazer*, 524 F.3d at 1246 (internal quotation marks omitted). Thus, the Court "must consider, based on the record before the administrator at the time its decision was made, whether the [C]ourt would reach the same decision as the administrator." *Id.* at 1246.

Here, the Court finds that Defendant's decision to terminate Plaintiff's long-term disability benefits was *de novo* wrong. Three of Plaintiff's doctors—Dr. Cone, Dr. Graham, and Dr. Liss—all examined Plaintiff and opined that Plaintiff's medical condition caused significant restrictions on Plaintiff's ability to perform the necessary tasks of his job. These doctors based their opinions on their actual examinations of Plaintiff and their review of standard neurological tests. Dr. Cone, Plaintiff's original treating physician, opined that Plaintiff was "unable to work" and informed

19

Defendant that Plaintiff continued to suffer from vision problems. (Admin. R. at CL000014-15, CL000095.) Dr. Graham, after conducting an extensive battery of cognitive tests, determined that Plaintiff suffered from profound cognitive problems, including severe attentional deficits. (*Id.* at CL000121-27.) Although Dr. Liss initially signed a form stating that Plaintiff was capable of returning to his occupation, he modified that opinion after conducting a more thorough examination, reviewing Dr. Graham's neuropsychological evaluation which he had ordered, and obtaining a more complete understanding of Plaintiff's job-related difficulties.[4] (*Id.* at CL000132-34.) Dr. Liss ultimately opined that Plaintiff "d[id] indeed have cognitive problems that impair[ed] his ability to work," and that Plaintiff could not perform any "gainful employment," much less his own occupation. (*Id.* at CL000132.)

Defendant suggests that Dr. Liss changed his medical opinion "to favor [P]laintiff only after he learned that [P]laintiff's benefits had been denied based in part on his original opinion." (Def.'s Br. in Supp. of Mot. for J. on Admin. R. 19 [hereinafter Def.'s Br.].) However, Defendant never asked Dr. Liss why he modified his opinion or how his two opinions could be reconciled. Defendant simply

---

[4]Notably, there is evidence in the record that Dr. Liss may not have known what he "checked" off on April 14, 2006 when he opined that Plaintiff was capable of performing his occupation. Dr. Liss stated in June 2006 that he had previously "signed a form noting that [Plaintiff] was mentally capable of handling his finances and such." (Admin. R. at CL000134.) A medical opinion that a claimant is capable of performing his or her occupation is quite different than a medical opinion that a claimant is mentally capable of handling his or her own finances.

decided to ignore Dr. Liss's modified opinion, even though Defendant
had sufficient evidence explaining that the opinion had been modified
after Dr. Liss performed a more comprehensive examination that
included a battery of additional tests.   Defendant provides no
rational reason for discounting Dr. Liss's opinion.[5]   Dr. Liss's
evaluation was apparently unassailable when he initially checked the
box supporting Defendant's position, yet his more recent modified
opinion, which he reached after a more thorough and extensive
evaluation, carried no weight with Defendant.   When Dr. Liss's
"opinion" supported a denial of benefits, Defendant showed him the
respect due an experienced, board-certified neurologist. When his
opinion changed, Defendant disregarded him as if he were either an
inexperienced intern or in cahoots with Plaintiff to manufacture a
claim. *See Glenn v. MetLife*, 461 F.3d 660, 663-65, 671-72 (6th Cir.
2006) (finding fault in administrator's reliance on form sent by
plaintiff's treating physician that plaintiff was able to work in
sedentary position where physician later reiterated his former
position that plaintiff was disabled and records overall supported
disability), *aff'd*, 128 S. Ct. 2343 (2008).

---

[5]The Court finds unconvincing Defendant's argument that Dr. Graham's
battery of cognitive tests "should be afforded little, if any, weight"
because Dr. Graham "conducted absolutely no symptom validity measures on
any of the relevant tests."  (Def.'s Reply Br. in Supp. of Mot. for J. on
Admin. R. 5 [hereinafter Def.'s Reply Br.].)  Dr. Liss, an experienced,
board-certified neurologist, found the tests reliable, as did Dr. Graham,
who actually performed them.

It is also noteworthy that Dr. Liss is not the only treating physician who opined that Plaintiff had a significant long-term disability.  In fact, all of Plaintiff's treating physicians have consistently reported findings that support a determination that Plaintiff is unable to perform the essential duties of his occupation.  Notably, Defendant relied upon these opinions in its initial determination that Plaintiff was disabled.  It was not until Dr. Liss checked the magic "I agree" box that things changed.  The Court does not fault Defendant for relying upon Dr. Liss's original statement, but when confronted with a detailed modified opinion that was comprehensive and well supported by the medical tests and examination of Plaintiff, Defendant was unreasonable in failing to reconsider its position.  Any reasonable claim examiner when comparing a "check in a box" to a comprehensive opinion based upon a detailed examination and substantial medical tests would, at a minimum, hold its evaluation in abeyance until it had an opportunity to clarify with the physician the apparent inconsistency.  It was unreasonable for Defendant's examiner not to be more diligent in following up with Dr. Liss. Defendant's apparent excuse—that it called Dr. Liss and he did not return the call—is unpersuasive.  Dr. Liss obviously had a legitimate reason not to return the examiner's inquiry immediately given that he was in the middle of recovering from a tornado that had damaged his office.  The examiner's urge to close the file should have been overcome by a desire to get it right,

22

which required a discussion with Dr. Liss before his opinion was summarily disregarded.

The Court also finds that the record otherwise does not support the denial of benefits. Although Plaintiff was able to perform certain activities of daily living, such as dressing and feeding himself, just two months after his June 2005 stroke (Def.'s Br. 16), performance of such household activities does not indicate that Plaintiff was able to perform his job or that Plaintiff was no longer disabled, *see Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003) (noting that plaintiff's ability to do some activities of daily living does not establish that he could do a full-time job); *cf. Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997) (recognizing in Social Security context that "participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).

Additionally, the Court rejects Defendant's contention that Plaintiff was no longer disabled based on statements in the record that Plaintiff was "'feeling about the same,'" "denied 'any new cranial nerve deficits, focal motor changes, sensory problems or coordination difficulties,'" and was "'doing well.'" (Def.'s Br. 16 (quoting Admin. R. at CL000135, CL000140, CL000192)). Defendant takes these isolated phrases out of context. "[E]vidence of an improvement, without a starting or ending point, does not help answer

23

the question of whether an individual can perform h[is] occupation." *Elliot v. Metro. Life Ins. Co.*, 473 F.3d 613, 620 (6th Cir. 2006). In other words, "'[g]etting better,' without more, does not equal 'able to work.'" *Id.; see, e.g., Myers v. Hercules, Inc.*, 253 F.3d 761, 767 (4th Cir. 2001) (noting that administrator took certain statements from medical records out of context in concluding that plaintiff was not disabled).

Based on a review of the record, the Court finds that Defendant's decision to terminate Plaintiff's long-term disability benefits was *de novo* wrong. *Cf. Creel v. Wachovia Corp.*, No. 08-10961, 2009 WL 179584, at *7-*8 (11th Cir. Jan. 27, 2009) (determining that administrator's benefits-denial decision was both wrong and unreasonable where plaintiff produced sufficient subjective medical evidence that she was disabled and administrator neither identified any objective evidence to the contrary nor had plaintiff undergo physical examination to test validity of her complaints). The Court must next determine whether Defendant's denial was nevertheless reasonable under the arbitrary and capricious standard. For the following reasons, the Court finds it was not.

## IV.  Defendant's Denial of Plaintiff's Long-Term Disability Benefits Was Arbitrary and Capricious

"In reviewing a termination of benefits under the arbitrary and capricious standard, the function of a reviewing court is to discern whether there was a reasonable basis for the decision, relying on the facts known to the administrator at the time the decision was made."

24

*Buckley v. Metro. Life*, 115 F.3d 936, 941 (11th Cir. 1997) (per curiam).  In other words, "[a]s long as a reasonable basis appears for [Defendant's] decision, it must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision."  *Jett*, 890 F.2d at 1140.

As previously explained, Defendant's denial of Plaintiff's benefits rests heavily on Dr. Walker's case review and a cold examination of Plaintiff's medical records.  Significantly, however, Defendant and its hired consultant ignored the most important records in the file and failed to exercise even minimal diligence in following up on arguable inconsistencies in the records.  Defendant's selective reliance upon its consultant's review of the medical records and failure to give any consideration to the opinions of Plaintiff's treating physicians, which opinions were favorable to Plaintiff, demonstrate an arbitrariness that resulted in an unreasonable denial of benefits in this case.

While it is true that administrators do not have to accord *per se* evidentiary weight to the opinions of treating physicians, "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  Here, Defendant is selective in the weight it gives to the opinions of Plaintiff's treating physicians.  Initially, Defendant found the opinions of Dr. Cone and Dr. Sidhpura supportive

of a finding that Plaintiff was disabled. Both had diagnosed Plaintiff with continuing neurological problems associated with the stroke which substantially interfered with Plaintiff's ability to work. Based on its investigation, which included these opinions, Defendant found Plaintiff eligible for long-term disability benefits on October 11, 2005. Shortly thereafter, on November 1, 2005, Plaintiff saw Dr. Liss for the first time. Dr. Liss documented Plaintiff's disabling condition. Then, in December 2005, one of Defendant's nurses opined that Plaintiff's disabling problems should have been resolved within six months of the stroke. She noted, however, that based on Plaintiff's history, "loss of functionality would be supported," opining that his vision would "either correct itself or it won't." (Admin. R. at CL000015.) Subsequently, on February 3, 2006, Dr. Cone informed Defendant that Plaintiff's vision problems were unchanged. Within a month, Defendant's nurse proclaimed Plaintiff "appear[ed] to be medically stable" and "should be able to perform a sedentary occupation with possible restrictions for double vision." (*Id.* at CL000012.) Plaintiff disagreed with these conclusions and informed Defendant that he was continuing to have problems. Defendant then sent the first letter to Dr. Liss, and Dr. Liss checked the box arguably agreeing with Defendant's assessment. Apparently finding Dr. Liss to be the quintessential medical professional at that time, Defendant shortly thereafter terminated Plaintiff's benefits.

26

When Dr. Liss modified that opinion after performing a detailed examination with an accompanying battery of tests, Defendant lost confidence in Dr. Liss's medical judgment.  Instead, it circled the wagons and began building its justification for continuing to deny benefits.  Rather than rely upon the treating physicians, Defendant pointed to its examiner's review.  That review ignored the significant opinions of the treating physicians, opinions which were based upon clinical findings and a battery of tests, not some cold review of selective medical records.

As previously stated, the Court finds it significant that Defendant's reviewer, Dr. Walker, did not even consult with Dr. Liss before submitting her case review.  Thus, Defendant did not find it important to find out Dr. Liss's explanation for the difference in his original "check the box" opinion and his more recent thorough medical evaluation.  Perhaps, Dr. Walker and Defendant's lack of diligence can be explained because the explanation for the difference is obvious—Dr. Liss, upon thoroughly examining Plaintiff and reviewing additional tests, had come to the unequivocal conclusion that Plaintiff was unable to perform the essential duties of his occupation and was unable to return to gainful employment.  Had this been confirmed by the reviewer with Dr. Liss, Defendant's denial of benefits would almost certainly have been reconsidered by Defendant. Either through neglect or purposeful avoidance, Defendant did not follow up with Dr. Liss but instead maintained that Plaintiff had fully recovered and should be able to work.  Defendant had a duty to

do more.  It had a duty to give some consideration to Dr. Liss's opinion or provide a reasonable explanation for summarily rejecting it.  Defendant's cynical response that Plaintiff, aided and abetted by Dr. Liss, is a malingerer is not supported by the evidence in the administrative record.  The Court finds that the only reasonable explanation supported by the present record for Defendant's discounting of Dr. Liss's opinion is that by giving it any weight, Defendant would be forced to reverse its denial-of-benefits decision—something it did not want to do.

In conclusion, Defendant's decision to terminate Plaintiff's disability benefits was arbitrary and capricious.  It was not based on independent medical evidence or a fair reading of Plaintiff's medical records.  It ignored significant findings in the medical records and gave no consideration to the opinions of the treating physicians who knew Plaintiff's medical condition best, and who objectively evaluated the effect of that condition on his ability to work.  *See Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1326-27 (11th Cir. 2001) (holding that administrator's decision to terminate plaintiff's claims was wrong and unreasonable where administrator relied on nurse's review and opinion of its claim person that plaintiff was not disabled rather than upon independent medical evidence).

The Court notes that Defendant operated under a conflict of interest in this case because it was responsible for both determining

eligibility and paying benefits under the Policy. (*Cf.* Def.'s Reply Br. 9 (noting that Defendant had inherent conflict of interest as both evaluator and payor of claims).) *See Townsend v. Delta Family-Care Disability & Survivorship Plan*, 295 F. App'x 971, 975 (11th Cir. 2008) (per curiam) (noting that in most cases conflict of interest exists where plan administrator determines eligibility for benefits and also pays those benefits out of its own assets); *see also Levinson*, 245 F.3d at 1326 (holding that conflict of interest existed between defendant-administrator's fiduciary role and its profit making role because defendant-administrator paid out to beneficiaries from its own assets).

Since the Court has found that Defendant's decision to deny benefits was arbitrary and capricious based upon a review of the administrative record in this case, the Court does not need to determine whether Defendant's decision was motivated by this conflict of interest. Whether the denial was made because Defendant gave its own financial interest priority over its duty to evaluate Plaintiff's claim fairly and reasonably does not matter here. Even if Defendant was not motivated by financial considerations, its ultimate decision to deny benefits was arbitrary and capricious for the reasons previously stated in this Order.

**V.  Plaintiff's Remedy**

Based on the foregoing, the Court finds and concludes that Plaintiff is disabled and entitled to long-term disability benefits under the Policy and that he has been disabled since the date of Defendant's first determination that he was disabled.  Accordingly, Plaintiff is entitled to: (1) recover for his past long-term disability benefits that were denied, plus interest; (2) reinstatement of his long-term disability benefits into the future as long as he continues to be disabled and qualifies for those benefits under the Policy; and (3) an opportunity to make a claim for his litigation expenses, including attorney's fees.

As to his claim for litigation expenses, the Court observes that five factors will be considered in determining whether an award is appropriate:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

*McKnight v. S. Life & Health Ins. Co.*, 758 F.2d 1566, 1571-72 (11th Cir. 1985).  There is no presumption in favor of awarding attorney's fees under 29 U.S.C. § 1132(g)(1).  The prevailing party bears the burden of establishing the entitlement to an award of fees.  *See Freeman v. Cont'l Ins. Co.*, 996 F.2d 1116, 1119 (11th Cir. 1993)

30

("The law provides no presumption in favor of granting attorney's fees to a prevailing claimant in an ERISA action.").

Plaintiff shall file a brief and evidentiary support within twenty-one days of today's Order establishing the amount of his claim for past benefits plus interest and his claim for litigation expenses. To establish the amount of his litigation expenses, Plaintiff shall include an affidavit that identifies in detail the hours Plaintiff's counsel spent on this action and the applicable hourly rate(s). Plaintiff shall also include a proposed judgment. Defendant shall have twenty-one days to respond. If either side finds that an evidentiary hearing is necessary, that party shall inform the Court in their respective briefs.

CONCLUSION

For the reasons stated above, the Court finds that Defendant's decision to terminate Plaintiff's long-term disability benefits was arbitrary and capricious. Therefore, Defendant's Motion for Judgment on the Administrative Record (Doc. 22) is denied. Plaintiff is entitled to judgment in his favor as outlined in this Order with the amount to be determined after supplemental briefing and further proceedings consistent with this Order.

IT IS SO ORDERED, this 10th day of March, 2010.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE

31